UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIME RIVERA,<br><br>    Petitioner,<br><br>v.<br><br>RON BROOMFIELD,<br><br>    Respondent. | Case No. 21-cv-06520-HSG<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

    Petitioner, a state prisoner incarcerated at San Quentin State Prison, has filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of a conviction obtained against him in state court. Dkt. No. 1 ("Pet."). Respondent has filed an answer, Dkt. No. 21 ("Answer")), and Petitioner has filed a traverse. Dkt. No. 26. The Court has carefully considered the briefs submitted by the parties. For the reasons set forth below, the petition is DENIED.

## I. PROCEDURAL HISTORY

    On May 11, 2018, an Alameda County jury found petitioner guilty of two counts of a lewd act upon a child under the age of 14, Cal. Penal Code § 288(a) (against victim J.L.) (counts 1 and 2); one count of continuous sexual abuse of a child, Cal. Penal Code § 288.5(a) (against victim J.L.) (count 3); two counts of a lewd act upon a child who was 14 or 15 years old, and at least 10 years younger than Petitioner, Cal. Penal Code § 288(c)(1) (against victim J.L.) (counts 4 and 5); two counts of oral copulation with a person under the age of 18, Cal. Penal Code § 288a(b)(1) (against victim J.L.) (counts 6 and 7); two counts of sexual penetration by a foreign object of a person under the age of 18, Cal. Penal Code § 289(h) (against victim J.L.) (counts 8 and 9); one count of forcible rape, Cal. Penal Code § 261(a)(2) (against victim J.L.) (count 10); one count of

sexual penetration by a foreign object of an unconscious person, Cal. Penal Code § 289(d) (against victim B.T.) (count 11); and one count of attempted rape, Cal. Penal Code §§ 261(a)(2), 664 (against victim B.T) (count 12). The jury also found true the multiple victim allegations for Counts 1 and 10, and the substantial sexual conduct allegations for Counts 1 through 3. RT 1347-54; CT 212-13, 249-56.

On July 6, 2018, the trial court sentenced Petitioner to a total state prison term of 40 years. CT 212-215.1; RT 1375-1380.

On June 30, 2020, the California Court of Appeal affirmed the judgment of conviction. *People v. Rivera*, C No. A154951, 2020 WL 3529341 (Cal. Ct. App. Jun. 30, 2020).

On September 9, 2020, the California Supreme Court denied review. Answer, Exhs. 7, 8

On or about August 23, 2021, Petitioner filed the instant federal habeas action by filing the petition docketed at Dkt. No. 1. Dkt. No. 1. On or about October 4, 2021, the Court screened Dkt. No. 1 and found that it stated the following cognizable claim for federal habeas relief: Petitioner's right to due process was violated when the jury was instructed with CALCRIM No. 1193. Dkt. No. 12 at 2. The Court also informed Petitioner that if he wished to raise additional claims for federal habeas relief, he could do so by filing an amended petition that was complete in and of itself. The Court cautioned Plaintiff that he could not add to his petition piecemeal, i.e. by filing a pleading that sought to add to the petition docketed at Dkt. No. 1; and that any claims not included in an amended petition would be waived. Dkt. No. 12 at 2.

On October 22, 2021, Petitioner filed a first amended petition ("FAP"). Dkt. No. 14. The FAP set forth only two claims: (1) Petitioner's sentence violated state sentencing law; and (2) trial counsel was ineffective. Dkt. No. 14. The Court dismissed the sentencing error claim with prejudice because an alleged error in interpretation or application of state law does not state a claim for federal habeas relief. Dkt. No. 15 at 2. The Court dismissed the ineffective assistance of counsel claim because the first amended petition only set forth conclusory allegations of ineffective assistance of counsel.[1] Dkt. No. 15 at 2-3. The Court noted that the FAP did not

---

[1] The FAP listed the following inactions as ineffective assistance: failure to object to the introduction of evidence, failure to convey or establish a credible defense, failure to afford

2

include the instructional error claim found cognizable in the Court's October 4, 2021 Order to Show Cause, and that Petitioner therefore waived this claim by not including it in the FAP. Dkt. No. 15 at 3-4. The Court granted Petitioner leave to file a second amended petition and reminded him that, because an amended petition completely replaced all prior petitions, Petitioner must include in his second amended petition all the claims he wished to present and could not incorporate claims from prior petitions by reference. Dkt. No. 15 at 4.

On or about December 6, 2021, Plaintiff filed a second amended petition. Dkt. No. 19 ("SAP"). The SAP was the same as the initial petition, but with the addition of four handwritten pages pointing out purported inconsistencies in the evidence. *Compare* Dkt. No. 1 with Dkt. No. 19. The SAP did not raise an ineffective assistance of counsel claim. Like the initial petition, the only claim for federal habeas stated in the SAP was that Petitioner's right to due process was violated when the jury was instructed with CALCRIM No. 1193. *See generally* Dkt. No. 19. The Court ordered Respondent to show cause why federal habeas relief should not be granted on this claim. Dkt. No. 23. Respondent filed an answer, Dkt. No. 21,[2] and Petitioner filed a traverse, Dkt. No. 26.

## II. BACKGROUND

The following factual background is taken from the June 30, 2020 opinion of the California Court of Appeal:[3]

---

Petitioner the opportunity to provide counsel with credible evidence to contradict the information presented by the prosecution, failure to prepare, failure to communicate with Petitioner clearly, failure to call key witnesses on Petitioner's behalf, failure to "point and bring up all of the above," failure to understand Petitioner's concern of potential bias in seating a jury with eleven women, and failure to listen to Petitioner's concern that there was an "imposture witness." Dkt. No. 14 at 5-48. "All of the above" referred to a "Chronology Statement of Facts" prepared by Petitioner that listed 25 statements made during trial by various witnesses that Petitioner believed showed inconsistencies in the prosecution witnesses' testimonies and supported his version of events. Dkt. No. 14 at 7-9. The FAP did not provide details regarding the above failures to act, i.e. what evidence counsel failed to object to; how counsel failed to establish a credible defense, etc.

[2] Although Respondent filed an answer, Dkt. No. 21, addressing the SAP prior to the Court's issuance of an order screening the SAP, the answer correctly addresses the only cognizable claim in the SAP, *see generally* Dkt. No. 23.

[3] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), unless otherwise indicated in this order.

A. *Evidence Relating to Charged and Uncharged Offenses Against J.L.*
J.L., age 23 at the time of trial, was born in 1995 and was the oldest of her mother's six children. Her sister B.T., born in 1997, was the second oldest child. Growing up, J.L. and her family were close to Rivera. [FN 1] She thought of him like an uncle.

> FN 1: Rivera, who was born in 1964, had been married and had three children, but later divorced.

When J.L. was a child and an adolescent, Rivera engaged in inappropriate sexual conduct with her more than 40 times. The first incident occurred when J.L. was 12 years old. She and her family lived in San Francisco. At the time, Rivera was dating J.L.'s mother and living with her family.

J.L. was cleaning the family apartment when Rivera "came up to [her] and started grabbing" her. At first, she "just took it as play fighting 'cause it wasn't any sexual contact yet or—just play fighting." But, then, Rivera took J.L. to his bedroom and asked her if she "wanted to have fun."

Rivera proceeded to touch J.L.'s breasts and removed her shorts and underwear. He kissed her from her chest, "going down." He performed oral sex on her by placing his mouth on her vagina. She did not want him to do so, but did not say anything. Rivera then put his penis in J.L.'s vagina. He said "[i]t felt good," and ejaculated on her stomach. J.L. felt "[c]onfused, dirty," and sore.

J.L. did not say anything because on a previous occasion she had been abused by her mother's former boyfriend, Fernando, and when she told her mother, her mother did not believe her. J.L. was temporarily removed from her mother's home, but ultimately returned.

When J.L. turned 13 years old in April 2008, and before the family moved from San Francisco to Oakland in March 2009, Rivera placed his penis in her vagina approximately once or twice a month. During the same time period, about once a month, he placed his mouth and tongue on her vagina. On numerous occasions he also touched her breasts. J.L. felt "confused, dirty." She said: "I kind of hated myself."

Rivera gave J.L. gifts and told her he loved her. J.L. once asked Rivera how he would feel "if somebody was doing this to his daughter," and he replied, "No one will ever do it to my daughter." He also said that since J.L. never said no, she was agreeing to it. When asked if she felt like she had a choice in the matter, she testified, "Who was going to help me?"

In March 2009, just before she turned 14 years old, J.L. and her family moved to Oakland. Rivera was no longer living with J.L.'s mother, but was welcome in their home and was a regular guest. Rivera also moved to Oakland and J.L. would often go to his apartment.

During the period from April 2009 to July 2010, when J.L. was 14 and 15 years old, Rivera continued to fondle J.L.'s breasts and orally copulate her. He also frequently engaged in vaginal intercourse with her. Rivera continued to give J.L. money and gifts. He also gave her alcohol and marijuana.

J.L. felt Rivera was supportive of her, when others were not, including when she came out as gay. He also encouraged her to remain in school and get an education. But the sex acts made J.L. feel "disgusted," and she "went into a deep depression. [She] didn't understand why it was happening." However, she sometimes felt like Rivera was a "boyfriend" because he would always text and call her and give her "all the attention."

At a certain point, J.L. noticed Rivera paying attention to her sisters B.T. and S.L. She was concerned; she "didn't want them to go through what [she] did." She and Rivera argued when she confronted him about her observations of his conduct, and he denied it. She told him: "I am not dumb. I know how you are looking at them and how you hug them, the same way you do with me."

"So [J.L.] ended up making a deal with [Rivera].... He was allowed to do whatever he wanted [with J.L.] as long as he didn't touch them or go near them." If he violated the deal, J.L. would tell her mother what Rivera was doing. Otherwise, J.L. "wouldn't open [her] mouth." Rivera agreed.

In July 2010, when J.L. was 15 years old, her mother sent her to live in Nicaragua with her father; J.L. and her mother were not getting along, partly due to J.L. coming out as gay. After attending ninth grade in Nicaragua, and when she had turned 16 years old, J.L. returned to live with her mother because her father did not want her living with him anymore.

After returning to the Bay Area, at first J.L. tried to avoid Rivera, but Rivera kept "begging" her to see him. She eventually relented. She asked him for alcohol and marijuana to feel "numb," and he provided it. On that first occasion back with Rivera, she had intercourse with him in his apartment. Rivera also digitally penetrated her and put his mouth on her vagina.

From August 2011 to March 2013, when J.L. was 16 and 17 years old, Rivera put his mouth on her vagina about once or twice a month. He also put his penis in her vagina about once or twice a month. On more than one occasion, he penetrated her with his fingers.

Yet J.L. still considered Rivera her "best friend" because he was "always there for" her and always supported her. He also continued to give her gifts, money, alcohol, and marijuana. However, if he gave her things, she "had to pay it off by having sex."

When J.L. was 16, she became pregnant by Rivera. He denied it was his, so she had to threaten to have the baby and tell her mother it was his. He gave her something to drink that caused her terrible pain and bleeding and resulted in termination of the pregnancy.

On April 1, 2013, two days before J.L.'s 18th birthday, she got drunk and went to Rivera's apartment. He wanted to have sex, but J.L. refused. Rivera kept insisting and walked her toward a couch, touching her breasts and buttocks, kissing her neck, and taking off her pants.

Rivera told J.L. "it was going to be real fast, like 10 minutes tops, it's not going to hurt." "By the time [her] pants were off, he took his pants off and his boxers. He ended up penetrating [her], his penis inside [her] vagina." She tried pushing him away, but she was too drunk. She felt "dirty," "disgusted," and "couldn't even look at [herself] in the mirror." She was "really sore." That was the last time he put his penis in her vagina.

B. *Evidence Relating to Charged Offenses Against B.T.*
B.T., J.L.'s younger sister, was 19 years old at the time of trial. As did J.L., B.T. had always considered Rivera "a friend, a mentor, a family friend, an uncle, kind of." On occasion, he had bought her gifts and given her alcohol and marijuana. When B.T. was under 17 years old, Rivera had asked her if he could have sex with two of her friends who were also under 18 years of age; he said he would give B.T. and her friends money.

B.T. told him no "and stop being a weirdo." In March 2017, B.T. relocated back to the Bay Area after living for a period in Oregon with her mother and other siblings, except J.L. She

5

returned to be with her boyfriend, Lark. She arranged to stay with Rivera in his apartment in Oakland "until [she] got on [her] feet." She slept on the couch in his living room.

On June 7, 2017, B.T. returned to Rivera's apartment at 4:00 a.m. after a night out with Lark. She and Lark had consumed alcohol, smoked marijuana, and had sex. As was their arrangement, B.T. called Rivera to open the outside gate to the apartment because she did not have a key. After entering the apartment, B.T. put on a pair of sweatpants and went to sleep on the couch.

As B.T. was sleeping, Rivera lay down on top of her, pulled down her sweatpants and underwear, and put his finger in her vagina. When she woke, B.T. told Rivera to "get the fuck off," but he did not. Before she was able to push him off of her, he put his penis in her vagina.

B.T. was finally able to push Rivera off of her. There was a struggle, and she ran to the kitchen and got a knife. She and Rivera continued to struggle, and B.T. told Rivera to "get away from" her. Pointing the knife at him, she "told him to just fucking get out of here, and get away from" her. She also threatened to kill him. Eventually he went to his bedroom.

B.T. went outside and called Lark and J.L. to ask them to come to the apartment. When J.L. received the phone call, B.T. sounded hysterical; "[s]he was crying, she was mad." She asked J.L. to "please come." When J.L. said she could not because she had to go to work, B.T. finally said, "I need you. Jaime [Rivera] touched me." J.L. told B.T. to call the police and B.T. did.

J.L. went to Rivera's apartment about 7:30 or 8:00 a.m. and saw B.T. sitting in front of a church with a lot of police cars nearby. After the police had interviewed B.T., J.L. hugged her and told her, "I told him not to do that." Prior to that day, J.L. had never told B.T. that Rivera had sexually assaulted her.

Several Oakland police officers arrived at the scene and one interviewed B.T. He noticed scratch marks on her face. B.T. said that Rivera had penetrated her vagina with his finger and his penis. Later that day, B.T. told another officer that Rivera had digitally penetrated her and tried to have sex with her. That officer did not ask any follow-up questions regarding the sexual acts.

B.T. was taken to the hospital and, about 9:00 a.m., underwent a sexual assault examination. She told the nurse that earlier that day, "Jaime," the name she called Rivera, had forced his penis into her vagina. B.T. marked a form indicating that Rivera attempted to digitally penetrate her and punched her in the face while they fought.

The nurse found abrasions to B.T.'s knuckles on her right hand, her right arm, and her face. B.T. also had a bruise on her neck. B.T. did not have injuries to her genitalia but, according to the nurse, in about 50 to 60 percent of cases, rape examinations do not show evidence of physical injury.

J.L. went to the hospital to see B.T. While there, she talked to a police officer and finally revealed the sexual abuse to which Rivera had subjected her. She did so because Rivera "broke the deal. He wasn't supposed to touch her .... He was supposed to leave them alone." J.L. also "kind of got tired of being silent. [She] wanted to be heard." She also wanted B.T. to "know that [she] believed her and that she isn't alone in that pain."

C. *Evidence Relating to Uncharged Offense Against B.R.*
B.R., who was 24 years old at the time of trial (and not related to J.L. and B.T.), testified that when she was 19 years old she dated J.L., who was 17 years old at that time. On one

occasion, she and J.L. went to Rivera's apartment in Oakland. J.L. introduced B.R. to Rivera as her "uncle." B.R. and J.L. got drunk on alcohol supplied by Rivera. Rivera asked the girls if they wanted to "mess around, and have sex." Both said "no." B.R. felt "uncomfortable and then aggravated." Rivera "just kept asking, asking and [she] just kept telling him no."

Eventually, J.L. got sick and was throwing up in the bathroom. B.R. "blacked out." When she woke up, she was in Rivera's bedroom without her pants or underwear; she felt pain in her vagina. Rivera was gone and J.L. was in the living room. She went home and never saw J.L. again. B.R. told her mother about the rape, but did not report it to the police.

J.L. also recalled the incident. J.L. testified that she had brought B.R. to Rivera's apartment and that he had given them alcohol and marijuana. He said he wanted to have a "threesome," but J.L. and B.R. said no. J.L. got "pretty wasted" and went to the bathroom to throw up. When she got out, she did not see B.R. in the living room. She went into Rivera's bedroom and saw Rivera on top of B.R. having sex with her; J.L. yelled, "what the fuck." She then went into the living room and passed out. The next morning, she told B.R. what she had seen. B.R. was upset and said that Rivera had raped her.

D. Child Sexual Abuse Accommodation Syndrome (CSAAS) Testimony
Dr. Blake Carmichael, a clinical psychologist at the University of California at Davis Children's Hospital "CARE" Center (Child Adolescent Abuse Resource Education Diagnostic and Treatment Center), testified as an expert in the area of "child sexual abuse, the effects of sexual abuse on children, and the [CSAAS]." He explained CSAAS. He detailed the five components of the syndrome. Because by now the courts of this state are very familiar with CSAAS, we do not summarize his entire testimony. In short, the five components are: (1) secrecy; (2) helplessness; (3) entrapment; (4) delayed or unconvincing disclosure; and (5) recanting or retraction.

E. Charges, Verdicts and Sentence
The case went to the jury on twelve counts of felony sex crimes. The first 10 counts charged crimes committed against J.L. Counts 1 and 2 charged lewd acts upon a child under the age of 14 (Pen. Code, [FN 2] § 288, subd. (a)), and count 3 alleged continuous sexual abuse of a child (§ 288.5, subd. (a)). It was further alleged that the offenses involved substantial sexual conduct. (§ 1203.066, subd. (a)(8).)

FN 2: Further undesignated statutory references are to the Penal Code.

Counts 4 and 5 charged lewd acts upon a child who was 14 or 15 years old, and at least 10 years younger than Rivera. (§ 288, subd. (c)(1).) Counts 6 and 7 charged oral copulation with a person under the age of 18. (§ 288a, subd. (b)(1).) Counts 8 and 9 charged sexual penetration by a foreign object of a person under the age of 18. (§ 289, subd. (h).) Count 10 charged forcible rape. (§ 261, subd. (a)(2).)

Counts 11 and 12 charged crimes committed against B.T. Count 11 charged sexual penetration by a foreign object of an unconscious person (§ 289, subd. (d)), and count 12 charged forcible rape (§ 261, subd. (a)(2)). As to counts 1, 2, 3, 10, and 12, the district attorney alleged Rivera committed an offense specified in subdivision (c) of section 667.61 against more than one victim. (§ 667.61, subd. (e)(4).)

The jury found Rivera guilty of counts 1 through 11, and of attempted rape (§§ 261, subd. (a)(2) & 664), a lesser included offense of count 12. It found the multiple victim allegations true as to counts 1 and 10, and not true as to counts 2 and 3. It also found true the substantial sexual conduct allegations as to counts 1, 2, and 3.

After the trial court sentenced Rivera to a total state prison term of 40 years, he timely appealed.

*Rivera*, 2020 WL 3529341, at *1-*5.

### III.  DISCUSSION

**I.  Standard of Review**

A petition for a writ of habeas corpus is governed by AEDPA.  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  *Id.* at 405–06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that

8

application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

## II. New Arguments Raised in Traverse

In his traverse, Petitioner raises new challenges to his conviction. He argues that the evidence was insufficient to support his conviction; that his conviction was based upon evidence known to be false; that the prosecutor committed misconduct by vouching for the credibility of one of the witnesses; and the trial court improperly restricted the defense from presenting evidence of significant probative value. Dkt. No. 26 at 1-4. None of these arguments were raised in the operative petition. *See generally* Dkt. No. 19. And none of these claims were presented to the California Supreme Court. *See* Answer, Ex. 7.

"A traverse is not the proper pleading to raise additional grounds." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Nevertheless, a district court "has discretion, but is not required to" consider evidence and claims raised for the first time after the filing of the petition. *See Brown v. Roe*, 279 F.3d 742, 745 (9th Cir. 2002); *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000). This includes new claims raised by a petitioner in the traverse. *See, e.g., Jackson v. Roe*, 425 F.3d 654, 655 n.1 (9th Cir. 2005) (noting magistrate judge's consideration of new claim raised for first time in traverse). However, the Court declines to address the remaining new arguments raised in the traverse because these claims are unexhausted. Pursuant to 28 U.S.C. § 2254(b), habeas relief may not be granted unless a petitioner has exhausted his state remedies, which requires that the petitioner's contentions be fairly presented to the state courts and disposed of on the merits by the highest state court. *See James v. Borg*, 24 F.3d 20, 24 (1994). This Court is precluded from considering the new claims raised in the traverse because Petitioner has not presented these claims to the California Supreme Court. *See* 28 U.S.C. § 2254(b).[4]

---

[4] In addition, the new claims presented in the traverse are too conclusory to state cognizable claims for federal habeas relief. Petitioner does not identify which conviction is supported by insufficient evidence or how the evidence was insufficient to support the conviction; what evidence was false and how the prosecution or court knew it to be false; which witness the prosecution vouched for and how; and what evidence he was not allowed to present at trial or how that evidence was probative of his innocence.

9

### III. Instructional Error Claim

Petitioner argues that CALCRIM No. 1193 erroneously permitted the jury to consider expert testimony on Child Sexual Abuse Accommodation Syndrome ("CSAAS") as evidence that Joselyn Doe was telling the truth, thereby reducing the prosecution's burden of proof in violation of his federal constitutional right to due process.  Dkt. No. 19 at 25-41.  Respondent argues that habeas relief should be denied on this claim because the jury was instructed as to the limitations on the use of the expert testimony, the state court reasonably determined that the jury properly applied the instructions, and the federal habeas court must defer to the state court's reasonable application of the relevant Federal law.  Respondent further argues that even if the admission of this expert testimony were erroneous, the admission did not have a substantial or injurious effect on the verdict because defense counsel reiterated the limitations of the expert testimony in his closing argument and because the evidence against Petitioner was compelling.  Dkt. No. 21-1 at 15-17.

The California Court of Appeals denied the claim as follows.

> D. *Child Sexual Abuse Accommodation Syndrome (CSAAS) Testimony*
> Dr. Blake Carmichael, a clinical psychologist at the University of California at Davis Children's Hospital "CARE" Center (Child Adolescent Abuse Resource Education Diagnostic and Treatment Center), testified as an expert in the area of "child sexual abuse, the effects of sexual abuse on children, and the [CSAAS]." He explained CSAAS. He detailed the five components of the syndrome. Because by now the courts of this state are very familiar with CSAAS, we do not summarize his entire testimony. In short, the five components are: (1) secrecy; (2) helplessness; (3) entrapment; (4) delayed or unconvincing disclosure; and (5) recanting or retraction.
>
> . . .
>
> A. *Principles Governing CSAAS, CALCRIM No. 1193, and the CSAAS Testimony in This Case*
> Expert testimony about CSAAS is inadmissible on the issue of whether a particular child was actually sexually abused, but it is permitted "for the limited purpose of disabusing the jury of misconceptions as to how child victims react to abuse." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 392.) In particular, "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301; see also *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503 (*Gonzales*).) "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin*, *supra*, at p. 1301.)

Here, before Dr. Carmichael testified, the court instructed the jury in the language of CALCRIM No. 1193 as follows: "Ladies and Gentlemen, you will hear testimony from Dr. Blake Carmichael regarding [CSAAS]. Dr. Carmichael's testimony about this syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [J.L.]'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

Dr. Carmichael explained to the jury his education and professional experience and was qualified as an expert allowed to testify "in the area of child sexual abuse, the effects of sexual abuse on children, and the [CSAAS] ... based on his education, training and experience." He explained that he had not met J.L., had not reviewed the police reports in the case or any of the other evidence, and did not know anything about Rivera.

Dr. Carmichael's testimony was limited to explaining CSAAS, "an education tool to help people understand this population of kids who we know were sexually abused. And it's important to do that because there are some misconceptions, and misunderstandings, or expectations people might have for a kid who has been sexually abused." As indicated, Dr. Carmichael explained the five components of CSAAS: (1) secrecy; (2) helplessness; (3) entrapment or accommodation; (4) delayed or unconvincing disclosure; and (5) recanting or retraction.

At the close of evidence, the jury was again instructed pursuant to CALCRIM No. 1193 on the limited purpose of Dr. Carmichael's testimony. The concluding instruction read: "You have heard testimony from Dr. Blake Carmichael regarding [CSAAS]. Dr. Carmichael's testimony about sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [J.L.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." [FN 3]

> FN 3: Rivera did not object to the giving or wording of CALCRIM No. 1193. The Attorney General does not argue forfeiture.

B. *CALCRIM No. 1193 Does Not Make It Impossible To Use CSAAS Testimony To Evaluate the Believability of a Victim's Testimony Without Also Using It as Proof a Defendant Committed the Crimes Charged*

Rivera contends that the standard CALCRIM limiting instruction on CSAAS evidence as it related to the crimes involving J.L. is misleading and erroneous in two respects. First, where the defendant's guilt turns on the complaining witness's credibility, it is impossible to allow the jury to use expert testimony about CSAAS "in evaluating the believability of [the complaining witness's] testimony," without telling them to use it as proof that the complaining witness is telling the truth about the abuse.

Second, because the instruction's limiting language refers only to "the crimes charged against" the defendant, the instruction "does not preclude the jury from using CSAAS evidence as proof the defendant committed uncharged crimes described by the complaining witness, from which the jury would then naturally infer that the defendant had also committed the charged crimes." Rivera concludes that the instruction violated his right to due process by lightening the prosecution's burden of proof.

We review de novo whether a jury instruction correctly states the law. (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.) When a defendant claims an instruction was subject to erroneous interpretation by the jury, we inquire whether the jury was reasonably likely to have construed the instruction in a manner that violates the defendant's rights. (*Ibid.*; *People v. Covarrubias* (2016) 1 Cal.5th 838, 926.) We presume that jurors are intelligent

11

persons capable of understanding and correlating all instructions given. (*Franco, supra*, at p. 720.)

Rivera focuses on the last part of CALCRIM No. 1193, arguing that the language invites the jury to impermissibly rely upon CSAAS testimony as proof that the alleged abuse occurred. We disagree.

In *Gonzales, supra*, 16 Cal.App.5th at page 503, Division Six of the Second District Court of Appeal upheld CALCRIM No. 1193 against a challenge that the instruction is inconsistent and improperly allows CSAAS testimony to be used as proof that the victim was molested. (*Gonzales*, at pp. 503–504.) Consistent with CALCRIM No. 1193, the jury was instructed that the expert's testimony about CSAAS was not evidence that the defendant committed the crimes charged against him and that the jury could consider the evidence only in deciding whether the victim's conduct was "'not inconsistent'" with the conduct of someone who has been molested, and in evaluating the believability of her testimony. (*Gonzales*, at p. 503.) The defendant argued on appeal that it is impossible to use the CSAAS testimony to evaluate the believability of the victim's testimony without using it as proof that the defendant committed the charged crimes. (*Ibid*.)

The Court of Appeal disagreed that the instruction allowed the CSAAS testimony to be used as proof of sexual abuse. The court held that the instruction must be understood in the context of the expert's testimony that CSAAS is a tool to understand a child's reactions when he or she has been abused and is not a tool to diagnose whether a child actually has been abused. (*Gonzales, supra*, 16 Cal.App.5th at pp. 503–504.) The court held that "[a] reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS expert's] testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand that it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior." (*Gonzales*, at p. 504.) Thus, there is no conflict in the instruction. (*Ibid*.)

The reasoning of *Gonzales* is persuasive. The challenged instruction correctly informs jurors that they may use CSAAS evidence for the limited purpose of deciding the victim's conduct was not inconsistent with having been molested, but not to determine whether the victim's molestation claim was true. Thus, the instruction correctly describes the permissible and impermissible uses of such evidence. Nor are we persuaded by Rivera's analogy to *People v. Sanchez* (2016) 63 Cal.4th 665, which marked a recent, fundamental change in hearsay law, overturning long-settled precedent that had allowed admission of an expert's testimony to hearsay so long as it served as a basis for his or her expert opinion. Suffice it to say, among other things, the reliability problems presented by asking juries to follow limiting instructions in that context were of a different order than they are here.

The fact that CSAAS evidence may be offered to rehabilitate a witness's credibility does not mean expert testimony regarding CSAAS is itself evidence of guilt. As *Gonzales* explained, "A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert]'s testimony to conclude that [the victim]'s behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert]'s testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert]'s testimony will find both that [the victim]'s apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

C. *The Specific Focus in CALCRIM No. 1193 on Charged Offenses Does Not, by Negative Inference, Invite the Jury To Use CSAAS Testimony as Proof That a Defendant Committed Uncharged Crimes, or To Improperly Leverage Such Proof into Evidence of Commission of the Charged Crimes*

Rivera also argues CALCRIM No. 1193's statement that CSAAS testimony is not evidence he committed "the crimes *charged* against him" (italics added) was underinclusive. He contends the instruction was prejudicial because it did not preclude the use of CSAAS testimony as proof he committed uncharged abuse. Rivera reasons that based on CALCRIM No. 1193's prohibition against the use of CSAAS evidence for charged offenses, the jury may have used the CSAAS testimony as evidence he committed uncharged offenses, and then leveraged that conclusion to further conclude he had a propensity that included committing the charged offenses.

We are not persuaded. Use of the CSAAS testimony as evidence Rivera committed an uncharged offense would violate CALCRIM No. 1193's directive that CSAAS testimony is not evidence he committed the charged crimes, and leveraging it into proof of guilt on the charged crimes would also violate the most basic instructions given in this case. CALCRIM No. 1193 cannot be read in isolation. Of course, in separate instructions the court instructed the jury on the presumption of innocence and the prosecution's burden to prove Rivera guilty of the charged offenses beyond a reasonable doubt. When considered together, the instructions did not create any risk that jurors would believe they could rely on Dr. Carmichael's testimony to convict Rivera even if guilt had not been proven beyond a reasonable doubt based on other evidence.

D. *CALCRIM No. 1193 Did Not Lighten the Prosecution's Burden of Proof*

Finally, casting his attack on CALCRIM No. 1193 as a due process argument, Rivera contends, as the defendant did in *Gonzales*, *supra*, 16 Cal.App.5th 494, that the instruction "is not only wrong as a matter of law, but denies him due process by lightening the prosecution's burden of proof." (*Id*. at p. 504.)

This strain of the argument simply restates Rivera's other attacks on CALCRIM No. 1193. We reject it for the reasons we explained above. As the panel in *Gonzales* held, "the only use of evidence of the uncharged offenses is as evidence [the defendant] committed the charged offenses. Thus, use of the CSAAS testimony as evidence [the defendant] committed the uncharged offenses would violate the instruction that CSAAS testimony is not evidence he committed the charged offenses.... CALCRIM No. 1193 was proper and did not violate due process." (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

*Rivera*, 2020 WL 3529341, at *4-*8.

**A.  Legal Standard**

Claims of error in state jury instructions are generally matters of state law only and thus not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Id*. at 72; *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). Jury instructions must be considered by a federal habeas court in their entirety, and not in isolation. *See Estelle*, 502 U.S. at 72 (citation omitted). The challenged instruction must be more than merely erroneous; instead, a petitioner

13

1  must show there was a "reasonable likelihood that the jury has applied the challenged instruction
2  in a way that violates the Constitution." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citations
3  omitted). Moreover, even if instructional error is found to rise to the level of a constitutional
4  violation under this standard, federal habeas relief is unavailable unless "the error, in the whole
5  context of the particular case, had a substantial and injurious effect or influence on the jury's
6  verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht v. Abrahamson*, 507 U.S.
7  619, 637 (1993)).

**B. Analysis**

Petitioner argues that the language of CALCRIM No. 1193 was misleading and erroneous in two ways.

First, Petitioner argues that, where the defendant's guilt turns on the complaining witness's credibility, as is the case here, it is impossible to allow the jury to use expert testimony about CSAAS in evaluating the believability of the complaining witness's testimony without the jury also using the CSAAS expert testimony as proof that the complaining witness is telling the truth about the abuse. This is because the last sentence of CALCRIM No. 1193[5] does not specify that the expert's testimony is not intended, and should not be used, to determine whether the victim's molestation claim is true. Even if the jury could have gleaned that point from CALCRIM No. 1193, Petitioner argues that the jury could not have applied the CSAAS evidence to determine the believability of Joselyn's testimony without also using that evidence to determine whether her molestation claims were true, and that the language to not consider Dr. Carmichael's testimony as "evidence that [Petitioner] committed any of the crimes charged against him" contradicts that the language authorizing the jury to consider Dr. Carmichael's testimony in evaluating Joselyn's credibility. Dkt. No. 19 at 29-35.

Second, Petitioner argues that, because the instruction's limiting language refers only to the charged crimes, the instruction does not preclude the jury from using CSAAS evidence as

---

[5] The last sentence of CALCRIM No. 1193 as given at trial stated: "You may consider [Dr. Carmichael]'s testimony only in deciding whether Joselyn Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." RT 1097.

proof the defendant committed the uncharged crimes described by the complaining witness, from which the jury would then naturally infer that the defendant had also committed the charged crimes. Dkt. No. 19 at 35-38.

Petitioner argues that these two flaws in CALCRIM No. 1193 impermissibly lessened the prosecution's burden of proof, thereby depriving him of due process, and that CALCRIM No. 1193 was therefore prejudicial as to all the convictions in his case. Dkt. No. 19 at 38-39.

Petitioner's claim fails for the following reasons.

First, Petitioner's arguments are contrary to state law, and this Court is bound by the state court's interpretation of state law, including state law regarding the purpose of CSAAS evidence and the meaning of CALCRIM No. 1193. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Mendez v. Small*, 298 F. 3d 1154, 1158 (9th Cir. 2002) ("[a] state court has the last word on interpretation of state law") (citations omitted). Petitioner argues that CSAAS evidence assumes a molestation has taken place and seeks to describe and explain common reactions of children to molestation, and that CALCRIM No. 1193 is inherently contradictory in that if the victim is believable, then the victim's account of events must be correct. The state court rejected both these arguments as contrary to the relevant governing state law authority, *Gonzales*. The *Gonzalez* court explained CALCRIM No. 1193 as follows:

> A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS expert's] testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the CSAAS expert's] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the CSAAS expert's] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction.

*Gonzales*, 16 Cal. App. 5th at 504. Relying on *Gonzales*, the state appellate court concluded that CALCRIM No. 1193 correctly described the permissible and impermissible uses of the CSAAS testimony and that the fact that CSAAS evidence may be offered to rehabilitate a witness's credibility did not mean expert testimony regarding CSAAS is itself evidence of guilt and CSAAS

15

evidence simply neutralized the victim's apparently self-impeaching behavior. *Rivera*, 2020 WL 3529341, at *7. The Court is bound by the state court's interpretation of state law.

Second, the jury is presumed to follow its instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Nothing about the evidence, arguments, or instructions in this case supports an inference that the jury misapplied CALCRIM No. 1193 to (1) improperly use Dr. Carmichael's testimony to determine whether Joselyn Doe's claims were true, and (2) improperly consider the CSAAS evidence as proof the defendant committed the uncharged crimes described by the complaining witness. Dr. Carmichael specified that he was providing the jurors with an educational tool to evaluate Joselyn's testimony, but did not opine on the specifics of the case. Dr. Carmichael testified that he knew nothing about the case or Petitioner, and had never met Joselyn. RT 1106-07. Dr. Carmichael described CSAAS an "educational tool" to help people understand the population of abused kids, and on cross-examination, agreed with the public defender that the existence of the five components of CSAAS did not indicate that an individual had been abused. RT 1108, 1130. The prosecution only referred to Dr. Carmichael's testimony to explain why her recantation should not impact her credibility, RT 1259, which is the intended use of CSAAS testimony. *Gonzales*, 16 Cal. App. 5th at 504 (CSAAS evidence neutralizes victim's apparently self-impeaching behavior).

Finally, the other jury instructions undermine a conclusion that the CALCRIM No. 1193 violated due process. The jury was instructed that the prosecutor had the burden of proving its case "beyond a reasonable doubt;" that evidence that was introduced for a limited purpose could be considered only for that purpose and no other; and that the jury did not have to accept an expert opinion as true and accurate. RT 1296, 1304-06.

For the foregoing reasons, the Court finds that the state court's denial of this claim was neither contrary to clearly established Federal law, nor based on an unreasonable determination of the facts. Federal habeas relief is denied on this claim.

//

//

//

## IV. CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## V. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the case.

**IT IS SO ORDERED.**

Dated:   6/28/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge